**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION**

| | |
|---|---|
| André Clark, Kevin Erny, Kristin Richeimer, Llarallynan Sutherland, and Murry Wynes, individually and as representatives of a class of similarly situated persons, and on behalf of the Oasis Retirement Savings Plan, <br><br> Plaintiffs, <br><br> v. <br><br> Oasis Outsourcing Holdings Inc., Oasis Outsourcing Inc., Oasis Retirement Savings Plan Investment Committee, Debra Bathurst, Barbara Drames, and Terry Mayotte, <br><br> Defendants. | Case No: <br><br><br><br> **CLASS ACTION COMPLAINT** |

## NATURE OF THE ACTION

1.      Plaintiffs André Clark, Kevin Erny, Kristin Richeimer, Llarallynan Sutherland, and Murry Wynes (collectively, "Plaintiffs"), individually and as representatives of the class described herein, and on behalf of the Oasis Retirement Savings Plan (the "Plan"), assert claims under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA"), against Oasis Outsourcing Holdings Inc., Oasis Outsourcing Inc., Oasis Retirement Saving Plan Investment Committee, Debra Bathurst, Barbara Drames, and Terry Mayotte (collectively, "Defendants"). As described herein, Plaintiffs allege that Defendants failed to satisfy their fiduciary duties or comply with prohibited transaction rules under ERISA, to the detriment of the Plan and its participants and beneficiaries. Plaintiffs make these claims derivatively on behalf of the Plan to obtain equitable and other relief from Defendants as provided by ERISA.

## PRELIMINARY STATEMENT

2.       Defined contribution plans have largely replaced defined benefit plans that were predominant in previous generations. By 2012, approximately 98% of employers offered defined contribution plans to their current employees, whereas only 3% offered defined benefit plans.

3.       In a defined benefit plan, the participant is entitled to a fixed monthly payment, while the plan sponsor is responsible for making sure the plan is sufficiently capitalized. Thus, the sponsor bears all risks related to excessive fees and investment underperformance. But in a defined contribution plan, participants' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1826 (2015). Participants thus bear the costs and risks, and they depend on the discretion of plan fiduciaries with respect to the expenses charged to them and the investments made available to them.

4.       To protect against the risk of cost overruns and poor performance, ERISA imposes strict fiduciary duties of loyalty and prudence upon all plan fiduciaries. 29 U.S.C. § 1104(a)(1).  The standard of care owed by ERISA fiduciaries is "the highest known to the law." *Herman v. NationsBank Trust Co*, 126 F.3d 1354, 1361 (11th Cir. 1997) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982)). Fiduciaries must act "solely in the interest of the participants and beneficiaries" and "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use." 29 U.S.C. § 1104(a)(1).

5.       Additionally, to prevent improper transactions between a fiduciary and a plan, and other transactions that benefit insiders to a plan, ERISA prohibits these transactions, unless the fiduciaries satisfy an exemption. These "prohibited transactions," described at 29 U.S.C. §

2

1106(a)-(b), are intended to "supplement[] the fiduciary's general duty of loyalty to the plan's beneficiaries," *Harris Trust & Sav. Bank v. Solomon Smith Barney, Inc.*, 530 U.S. 238, 241-42 (2000); *see also Donovan v. Walton*, 609 F. Supp. 1221, 1246 (S.D. Fla. 1985) ("*Walton*") ("Congress passed [§ 1106] to prevent certain categories of transactions which offer a high potential for insider abuse of plans or for loss of plan assets."), *aff'd sub nom. Brock v. Walton*, 794 F.2d 586 (11th Cir. 1986).

6.     The Plan is a multiple employer defined contribution plan ("MEP") sponsored by Defendant Oasis Outsourcing Holdings Inc., a "professional employer organization" (PEO). A PEO is a company that provides human resources, payroll, employee benefits, and other administrative services to employers who outsource some or all of those functions ("Client Employers"). Defendant Oasis Outsourcing Holdings Inc. and its operating subsidiary Defendant Oasis Outsourcing Inc. (together, "Oasis") manage and administer the Plan for Client Employers and their employees. These employees are the Plan's participants.

7.     Oasis has delegated responsibility for selecting and monitoring the Plan's investments and service providers to Defendant Oasis Retirement Savings Plan Investment Committee (the "Committee"). The Committee includes senior Oasis employees, Defendants Debra Bathurst, Barbara Drames, and Terry Mayotte (the "Trustees"). These responsibilities are fiduciary in nature under ERISA.

8.     Defendants did not satisfy ERISA's standard of care, and did not comply with ERISA's prohibited transaction rules, in their management and administration of the Plan's service provider relationships and investment menu options. Until 2017, Defendants utilized higher cost service vendors that provided business benefits to Oasis. This was inconsistent with Defendants' duties to manage the Plan "solely in the interest of the participants" and for the

"exclusive purpose" of "defraying reasonable expenses of administering the [P]lan". *See* 29 U.S.C. § 1104(a)(1)(A)(ii). The Plan's expenses exceeded the rates paid by peer plans, implying that Defendants also did not to manage the Plan "with the care, skill, prudence, and diligence" of a prudent fiduciary "acting in a like capacity". *See* 29 U.S.C. § 1104(a)(1)(B). Defendants' mishandling of the Plan's service provider relationships also limited the Plan's options for target-date fund (TDF) investments. This investment menu deficiency was detrimental to participants until it was belatedly corrected in mid-2014. In addition, Defendants have collected or authorized reimbursements from Plan assets for expenses that were not properly charged to the Plan. These reimbursements did not comply with ERISA's prohibited transaction rules. *See* 29 U.S.C. § 1106(a)-(b).

9.      Defendants' non-compliance with ERISA has cost the Plan millions of dollars in excess fees, lost investment earnings, and improper reimbursements. Moreover, Defendants continue to collect reimbursements for expenses related to the Plan, subjecting Plan participants to risk of improper deductions in the future.

10.      In order to remedy Defendants' unlawful conduct, on October 14, 2016, Plaintiffs initiated a Class Claim for Benefits pursuant to the claim procedure set forth in the terms of the Plan.[1] The claim procedure successfully resulted in the exchange of certain documents and information pertinent to Plaintiffs' claims, development and submission of expert reports, and greater understanding between the parties of their respective positions. However, Defendants have denied Plaintiffs' claims.

---

[1] *See Mason v. Continental Group, Inc.*, 763 F.2d 1219, 1227 (11th Cir. 1985) ("[P]laintiffs must exhaust their remedies under the pension plan agreement before they may bring their ERISA claims in federal court.").

11.     Plaintiffs bring this action to continue their pursuit of relief in this case. Plaintiffs assert four counts for violations of ERISA against Defendants: Count I, breach of the fiduciary duties of prudence and loyalty; Count II, failure by Oasis to monitor the actions of appointed fiduciaries (the Committee and Trustees); Count III, prohibited transactions with parties-in-interest to the Plan; and Count IV, prohibited transactions with fiduciaries of the Plan.

## JURISDICTION AND VENUE

12.     Plaintiffs bring this claim pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide that participants in an employee retirement plan may pursue civil relief on behalf of a plan to remedy breaches of fiduciary duties and other prohibited conduct, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. §§ 1109 and 1132.

13.     This case presents a federal question under ERISA, and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1)(F).

14.     Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the district where the Plan is administered, where the breaches of fiduciary duties giving rise to this action occurred, and where Defendants may be found.

## THE PARTIES

### PLAINTIFFS

15.     Plaintiff Clark resides in Stone Mountain, Georgia, and is a former participant in the Plan. In the second quarter of 2017, Plaintiff Clark took a distribution of the balance of his Plan account. Plaintiff Clark's Plan account would have been worth more at the time it was distributed from Plan if not for Defendants' violations of ERISA set forth in this Complaint.

16.     Plaintiff Erny resides in Charlotte, North Carolina and is a former participant in the Plan. In the third quarter of 2015, Plaintiff Erny rolled his Plan retirement savings into

another plan. Plaintiff Erny's Plan account would have been worth more at the time of the rollover if not for Defendants' violations of ERISA set forth in this Complaint.

17.     Plaintiff Richeimer resides in Lafayette, Colorado, and is a current participant in the Plan. Plaintiff Richeimer's Plan account would be worth more today if not for Defendants' violations of ERISA set forth in this Complaint.

18.     Plaintiff Sutherland resides in El Cajon, California, and is a current participant in the Plan. Plaintiff Sutherland's Plan account would be worth more today if not for Defendants' violations of ERISA set forth in this Complaint.

19.     Plaintiff Wynes resides in Golden, Colorado, and is a current participant in the Plan. Plaintiff Wynes' Plan account would be worth more today if not for Defendants' violations of ERISA set forth in this Complaint.

### THE PLAN

20.     The Plan was established on January 1, 1997, by Oasis Outsourcing Holdings Inc. The Plan is governed by a written statement of terms called the "Plan Document."

21.     The Plan is a multiple employer 401(k) profit sharing plan, and is qualified for tax treatment under 26 U.S.C. § 401.

22.     The Plan is funded by contributions received from Client Employers who executed an agreement with Oasis adopting the Plan for the benefit of their employees. The Client Employers transfer contributions to Oasis from eligible employees' earnings, plus any matching contributions from the Client Employer. Contributions are pre-tax and may be made up to annual limits determined by the Internal Revenue Service (IRS).

23.     Oasis places all contributions in trust, which constitutes a common fund in which each Participant has an undivided interest. Oasis maintains an account reflecting each individual's share of the trust. The objective of the Plan is for contributions to grow through

investment until an employee reaches retirement age and retires, at which time the participant or an appointed beneficiary is entitled to receive the value of the participant's account. However, if participants separate from employment with a Client Employer or satisfy other conditions, they may rollover their account balance to another qualifying plan, or receive a distribution, subject to applicable taxes and penalties.

24.     Between 2010 and the present, the Plan has had between 10,000 and 30,000 participants with positive account balances, and between $200 million to $1.2 billion in total assets. The largest increase occurred recently; as of the end of 2016, the Plan had 19,897 participants with account balances and $563 million in assets. Participants are limited to the investment options available within the Plan. The menu of investment options available within the Plan is determined by the Committee and Trustees, subject to oversight by Oasis. The expenses of administering the Plan, including compensation of service providers and any reimbursements paid to Oasis, are paid at the direction of the Committee and Trustees from the assets of the Plan, subject to oversight by Oasis.

**DEFENDANTS**

*Oasis Outsourcing Holdings Inc.*

25.     Defendant Oasis Outsourcing Holdings Inc. is a business corporation organized under the laws of the State of Florida. Oasis Outsourcing Holdings Inc. was incorporated as Wackenhut Resources Inc. in January 1997, and changed its name to Oasis Outsourcing Holdings Inc. in March 2003. Oasis Outsourcing Holdings Inc. has its principal place of business in West Palm Beach, Florida.

26.     Oasis Outsourcing Holdings Inc. is the sponsor of the Plan, and also controls and manages the operation and administration of the Plan. Oasis Outsourcing Holdings Inc.'s authority includes, but is not limited to, appointing and removing the Trustees; establishing the

7

Committee and its duties; monitoring the Trustees and the Committee; paying expenses of administering the Plan from Plan assets; deciding all claims for benefits; deciding all matters involving the rights of participants; appointing such advisors, counsel, and specialists as may be needed to assist in carrying out its duties; and amending the Plan. Oasis Outsourcing Holdings Inc. is a fiduciary of the Plan pursuant to 29 U.S.C. § 1002(21)(A)(i),(iii) because it exercises discretionary authority, control, and responsibility respecting management and administration of the Plan and the disposition of Plan assets.

***Oasis Outsourcing Inc.***

27.    Defendant Oasis Outsourcing Inc. is a business corporation organized under the laws of the State of Florida. Oasis Outsourcing Inc. was incorporated in July 1996. Oasis Outsourcing Inc. has its principal place of business in West Palm Beach, Florida. Oasis Outsourcing Inc. is a wholly-owned subsidiary of Defendant Oasis Outsourcing Holdings Inc.

28.    Oasis Outsourcing Inc. performs fiduciary functions on behalf of Oasis Outsourcing Holdings Inc. In certain communications to Plan participants, Oasis Outsourcing Inc. has been identified as the Plan's fiduciary. In effect, Defendant Oasis Outsourcing Holdings Inc. delegated fiduciary responsibilities for administering the Plan and investing the Plan's assets to the Oasis Outsourcing Inc. Pursuant to these delegated responsibilities, Defendant Oasis Outsourcing Inc. exercises discretionary authority, control, and responsibility respecting management and administration of the Plan and the disposition of Plan assets, and is a fiduciary of the Plan pursuant to 29 U.S.C. § 1002(21)(A)(i),(iii).

***Oasis Retirement Savings Plan Investment Committee***

29.    Defendant Oasis Retirement Savings Plan Investment Committee (the "Committee") is the collection of individual Trustees of the Plan appointed by Oasis. The

Committee also includes any additional individuals appointed by Oasis or the Trustees to assist in carrying out the duties delegated to the Committee. The Committee members have been senior Oasis employees at all relevant times.

30.     The Committee, as created by Oasis and acting upon Oasis' authority, has discretion to select and change the investment options available under the Plan, hire and terminate services providers to the Plan, and negotiate fees and services with such service providers. Pursuant to 29 U.S.C. § 1002(21)(A)(i),(iii), the Committee is a fiduciary of the Plan because it has discretionary authority and control respecting the management of the Plan and disposition of Plan assets.

***Trustees***

31.     The Trustees are natural persons appointed by Oasis to discharge the duties assigned by Oasis to the Committee. Trustees Mayotte and Drames have served as trustees since prior to 2010, and Trustee Bathurst has served since 2012. Based on their duties in connection with the Committee, the Trustees are fiduciaries of the Plan pursuant to 29 U.S.C. § 1002(21)(A)(i),(iii), as they exercise discretionary authority and control respecting the management of the Plan and disposition of Plan assets.

## DEFENDANTS' VIOLATIONS OF ERISA

### I.     OASIS FAILED TO DEFRAY REASONABLE PLAN EXPENSES.

32.     The Plan more than tripled in size between 2005 and 2010. This growth occurred alongside growth in Oasis' business. Oasis markets the Plan as a "free" benefit to Employer Clients. Many of these Employer Clients pay Oasis for other PEO services.

33.     Oasis does not operate the Plan at a loss. Instead, the Plan's expenses are borne by the participants. Retirement plans benefit from economies of scale; therefore, the Plan's rapid growth created opportunity to reduce these expenses for participants. As the fiduciaries of the

Plan, Defendants had a duty to monitor the Plan's costs, investigate the Plan's options, and negotiate on behalf of the Plan to obtain necessary services without unnecessary expenses. However, Defendants failed to discharge these duties consistent with ERISA's standard of care.

34.     Beginning in 2004,[2] Defendants utilized Lincoln Financial Group[3] ("Lincoln") and Pinnacle Financial Services ("Pinnacle") to administer the Plan. Lincoln and Pinnacle provided enrollment, data, recordkeeping, processing, and communication services. Lincoln also made investment funds available to the Plan through group variable annuity contracts, which Pinnacle helped administer.

35.     The Lincoln-Pinnacle program imposed layers of fees on participants. There were fees charged as  a percentage of each participant's total account balance; fees charged as a flat rate per-participant; fees charged as a percentage of each participant's account balance in each investment fund (with portions paid to Lincoln or Pinnacle, and portions to external fund managers); and additional flat rate fees charged when participants chose to use certain services, like loan processing and maintenance, or distributing their account.

36.     The Plan's total costs under the Lincoln-Pinnacle program were excessive. As of 2010, the Plan's costs were approximately two times higher than the costs of other similarly-sized plans operated by the PEOs. Although the Lincoln-Pinnacle program was compatible with MEPs, other PEOs using the same program for their MEPs were much smaller than the Plan.

37.     The investment fee structure and expense ratios contributed to the Plan's excessive costs. Lincoln made certain investment options available to the Plan as annuity

---

[2] Defendants' relationship with Pinnacle sans Lincoln dates back prior to 2004.

[3] Lincoln Financial Group is the marketing name used by a family of companies that offers insurance and investment products and services. The Plan had relationships with multiple Lincoln companies, which operated in coordination with one another; therefore, Plaintiffs refer to Lincoln companies collectively.

separate accounts. The same investments would have been available to the Plan as lower-fee mutual funds if Defendants switched to an open architecture investment platform. By using Lincoln's annuity separate accounts, Defendants accepted additional fees, paid to Lincoln and Pinnacle, that were added on top of the mutual fund fees. Moreover, Lincoln did not always offer the lowest cost share class of the underlying mutual funds, which added to the excess fees paid by the Plan. If Defendants had closely monitored the expenses associated with Lincoln's annuity separate accounts consistent with their fiduciary duties, Defendants would have negotiated appropriate changes or promptly replaced these annuity separate accounts with more appropriate alternatives.

38.     Oasis had its own reasons for staying with Lincoln and Pinnacle, notwithstanding the high costs for participants. The fee arrangements generated more revenue for Lincoln and Pinnacle than required. The excess was made available to Oasis for use in connection with the Plan. This was a reliable mechanism for Oasis to ensure that it would not be required to bear any costs associated with the Plan. It also allowed Oasis to avoid making a separate charge visible on participant account statements.

39.     In addition, Lincoln and Pinnacle provided sales and marketing support services to Oasis. These services were included in the fees charged to participants. Indeed, Pinnacle provided staffing services to Oasis, with Pinnacle employees functioning as members of the Oasis sales team from 2010 to 2013. All three companies benefited from coordinating their sales and marketing efforts. Although the bulk of the fee revenue from increased Plan enrollment was paid to Lincoln and Pinnacle, Oasis used promotional campaigns regarding the Plan to establish or strengthen relationships with Client Employers, who paid Oasis for other PEO services.

40.     Replacing Lincoln and Pinnacle, or negotiating meaningful fee concessions, would have risked disturbing this successful (and cost-free) promotional apparatus for Oasis. It also would have jeopardized Oasis' access to indirect fees from the Plan. Defendants therefore gave short shrift to any alternatives that would require Oasis to terminate or materially modify its relationships with Lincoln and Pinnacle, notwithstanding the interest of Plan participants in reducing their fees.

41.     In fact, Defendants received unsolicited proposals from other service providers in 2010, which would have reduced the Plan's annual costs by 17% to 32%. The savings would have been worth between approximately $400,000 and $900,000 per year for participants initially, and more as the Plan continued increase its assets. However, Defendants did not seriously consider these bids. The Plan remained with Lincoln and Pinnacle.

42.     Moreover, if Defendants had scrupulously investigated additional options in the marketplace (beyond unsolicited bids), diligently attempted to eliminate waste, and fully utilized the Plan's leverage in negotiations, Defendants could have reduced participants' costs even more, by a total of 45% to 50%. This would have brought the Plan's expenses in line with the expenses of other large PEO plans. In dollars, such savings would have been worth $1.5 million to participants initially, and more as assets increased. Unfortunately, Defendants' did not begin this process until 2015, and did not successfully reduce the Plan's costs to the level of similarly-sized PEO plans until 2017.

43.     Defendants' failure to put participants' interests first became clear in the years between 2010 and 2017. Problems with Lincoln and Pinnacle came to the forefront and forced Defendants to terminate Pinnacle in 2014 and Lincoln in 2017. Pinnacle failed to keep pace with its administrative duties, like preparing regulating filings and communicating with participants,

creating risks for Defendants. In addition, Defendants had conflicts with Lincoln over the Plan's investment options, and Lincoln was inflexible with respect to Defendants' requests. Yet, Pinnacle had faltered in its duties prior to 2010, and the limitations of Lincoln's investment platform likewise should have been known to Defendants before 2010, *if* they had diligently investigated the merits of retaining Lincoln from the perspective of Plan participants. It is apparent, however, that Defendants did not consider these issues when presented with lower cost bids in 2010. In addition, although Defendants acknowledged these problems by 2011 and 2012, Defendants were slow to redress them.

44.     Oasis conducted request for proposal (RFP) processes in 2010 and 2013, but did not sufficiently consider available types of service providers and service structures and platforms during those processes. Specifically, in 2010 Oasis should have investigated and considered (1) service providers other than insurance companies and (2) bundling the services provided by Lincoln and Pinnacle with a single service provider. In 2013, Oasis should have replaced Lincoln as recordkeeper in light of the high fees and limited investment options associated with Lincoln's investment platform.

45.     A prudent, impartial fiduciary would have taken measures to reign in the Plan's costs by 2010.  In retaining high-cost services that were unsatisfactory for the needs of the Plan and Plan participants (but beneficial to Oasis' business), Defendants fell short of their fiduciary duties, and cost participants millions of dollars in excessive fees.

**II.     OASIS FAILED ACT PRUDENTLY OR IN THE INTEREST OF PARTICIPANTS IN RETAINING LINCOLN'S TDFS.**

46.     Many retirement plans, including the Plan, offer TDFs—popular investment strategies designed to grow more conservative as a participant approaches retirement age. In the mid-2000s, TDF strategies were catching on, and by 2012 a significant majority (about 70%) of

plans offered TDFs (up from 29% in 2006). This created a competitive marketplace for TDFs, with many choices for fiduciaries, and de-escalating fees. A prudent fiduciary around 2010 would have surveyed the marketplace and selected a TDF series with competitive fees and a proven track record for performance. Defendants' selection and retention of TDFs for the Plan, however, came up short.

47.     Prior to 2010, Defendants utilized Lincoln's proprietary series of TDFs.[4] By 2010, Defendants should have come to the conclusion that Lincoln's proprietary TDFs were not competitive in the marketplace, and selected a new TDF option for participants. In 2009, the average TDFs offered in plans the size of the Plan had expenses of 63 basis points.[5] Lincoln's TDFs were significantly more expensive, and cost 91 to 94 basis points. No fiduciaries of similarly-sized plans had selected Lincoln's TDFs. Lincoln's TDFs also has unfavorable performance records compared to their stated benchmarks. Defendants noted concerns, but did not promptly considering replacing Lincoln's TDFs. Although not an excuse for Defendants, at that time, a relatively small percentage of Plan assets (approximately 2%) were invested in the TDFs.

48.     Defendants had a new opportunity to act in the interest of participants in 2011. Defendants were required to select a new default fund for the Plan based on the anticipated closure of the Plan's existing default option.[6] The Plan's default fund held approximately 50% of

---

[4] The Lincoln TDFs changed names twice during the relevant time, from "LVIP Wilshire" to "LVIP Protected Profile" to "LVIP Managed Risk".

[5] One basis point is equal to 0.01%.  *See* INVESTOPEDIA, "Basis Point", *available at* https://www.investopedia.com/ask/answers/what-basis-point-bps/.

[6] A default fund, otherwise known as a "Qualified Default Investment Alternative", is a default option a plan may designate under ERISA for investment of participant contributions for which no specific investment direction has been provided by the participant. 29 C.F.R. § 2550.404c-5.

the Plan's assets, and those assets would be transferred to the new default option designated by Defendants.

49.     In light of increasing traction of TDFs among retirement plans, Defendants decided that the default option should be a TDF series. Defendants were not satisfied with Lincoln's TDFs, so they researched other options. Based on their findings, Defendants asked Lincoln to include a non-proprietary TDF option in the variable annuity contracts utilized by the Plan. However, Lincoln refused, and Defendants acquiesced. As a result, approximately one half of the Plan's assets were transferred to Lincoln's TDFs in mid-2012.

50.     Defendants bear the responsibility for being forced into an undesirable investment decision by Lincoln. A prudent, impartial fiduciary would not have permitted this result. Defendants should have considered Lincoln's flexibility, or lack thereof, with respect to investments at the time that Defendants rejected other vendors in 2010 (see *supra*, Section I). Defendants either should have pursued a more favorable investment platform at that time, or used the Plan's leverage to obtain commitments from Lincoln on expanding its investment offerings.

51.     When Lincoln refused to accommodate Defendants' request for a non-proprietary TDF option in 2011 and 2012, Defendants failed again. Although Lincoln preferred to prop up its proprietary products, the reality was that Lincoln needed to offer funds from outside managers to enhance the competitiveness of its variable annuity contracts. Indeed, Lincoln offered many outside funds in other investment strategies; it was only reluctant yield its monopoly on TDF investments in its variable annuities. Defendants' failure to persuade Lincoln and resulting

---

A fiduciary must satisfy ERISA's standard of care in the process of investigating and selecting a QDIA. 29 C.F.R. § 2550.404c-5(b)(2).

investment of half of the Plan's assets in unwanted funds suggests that Defendants' efforts on behalf of participants did not satisfy ERISA's standard of care.

52.     Eventually Lincoln did yield to market pressures and add an outside TDF series (managed by Vanguard) to its variable annuity contracts utilized by the Plan. Defendants moved the Plan's default investments to the Vanguard TDFs in mid-2014. Participants, however, lost millions of dollars of investment earnings due to underperformance of Lincoln's TDFs prior to that point, for which Defendants have not compensated participants who had their accounts invested in Lincoln's TDFs.

### III.    OASIS AUTHORIZED INAPPROPRIATE REIMBURSEMENTS FROM THE PLAN.

53.     Defendants have exercised continuous control over certain Plan assets made available for reimbursement of Oasis' expenses in connection with the Plan. Under the Lincoln program, these assets were transferred to Oasis indirectly from other fees charged to participants. See *supra*, Paragraph 37. After Lincoln, Oasis has collected fees directly from participant accounts through a separate charge noted on participants' account statements. In each case, Oasis' use of the funds has been constrained by ERISA's prohibited transaction rules. Likewise, Oasis' approval of certain reimbursements paid to others has been limited by ERISA's prohibited transaction rules.

54.     ERISA's prohibited transaction rules prohibit fiduciaries from causing a plan to engage in certain transactions with a "party in interest",[7] including transactions involving the transfer of plan assets for use by or for the benefit of the party in interest and the furnishing of services between the plan and the party in interest. 29 U.S.C. § 1106(a)(1)(C-D). Further, the

---

[7] A "party in interest" includes fiduciaries, administrators, and service providers of a plan, and other persons with a close relationship to the plan or another party in interest, including employees and affiliates. *See* 29 U.S.C. § 1002(14).

prohibited transaction rules prohibit a fiduciary from dealing with the plan's assets "in his own interest or for his own account," representing interests "adverse" to the plan's interests in a transaction involving the plan, and receiving consideration "for his own personal account" from any party in connection with a transaction involving the assets of the plan. 29 U.S.C. § 1106(b)(1-3).

55.    These rules contain certain exemptions for transactions with parties in interest that would otherwise violate section 1106(a). However, to qualify for an exemption, a party in interest transaction generally must be limited to "reasonable compensation" and be "necessary" for the establishment and operation of the Plan (among other things). *See* 29 U.S.C. § 1108(b)(2).

56.    These rules also permit payments to fiduciaries if such payments are limited to "the reimbursement of direct expenses properly and actually incurred and not otherwise reimbursed." 29 C.F.R. § 2550.408c-2(b)(2); *Martin v. Walton*, 773 F. Supp. 1524, 1527 (S.D. Fla. 1991) ("[R]eimbursement by employee benefit plans to a fiduciary [is prohibited] if, under the circumstances, such expenditure would not constitute a reasonable expense properly incurred in administering the plan.").

57.    The Department of Labor (DOL) has distinguished permissible reimbursement of a fiduciary's "direct expenses properly and actually incurred" from prohibited transactions that violate Section 1106. Generally, expenses incurred in connection with "settlor" functions—as opposed to fiduciary functions—are not properly incurred with respect to a plan, and cannot be paid with plan assets. Settlor functions "include decisions relating to the establishment, termination and design of plans[.]" *Id., at 8723*; *see also Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 444 (1999) (explaining that decisions about plan design and structure are settlor functions). As explained in a DOL advisory opinion:

> Expenses incurred in connection with the performance of settlor functions would not be reasonable plan expenses as they would be incurred for the benefit of the employer and would involve services for which an employer could reasonably be expected to bear the cost in the normal course of its business or operations.

Advisory Op. 01-01A (Jan. 18, 2001); *see also* Advisory Op. 97-03A (Jan. 23, 1997); Information Letter to J. Erlenborn from D. Kass (March 13, 1986).

58.     A host of transactions authorized by Defendants ran afoul of these rules. Generally, Defendants used Plan assets to pay certain Oasis employees, as well as certain employees of staffing agencies affiliated with Oasis. However, these employees' work in connection with the Plan included settlor functions, and the amount of the salary and wage reimbursements exceeded a reasonable amount for work that was properly paid by the Plan. Defendants also allowed commissions payable by Lincoln to be reimbursed through fees charged to the Plan. These reimbursements also amounted, in substance, to unreasonable compensation for settlor functions. In addition, Defendants directed payments to third parties where the purpose of the payment was to benefit Oasis, not the Plan. These transactions included marketing the Plan to potential Client Employers and resolving issues related to Pinnacle's exit in 2014. Oasis should have borne these expenses without reimbursement by the Plan.

59.     Although Defendants have brought the Plan's total costs in line with peer plans, eliminated commissions, and re-structured payments to Oasis so that these fees are disclosed on participant's account statements, the potential for improper use of Plan assets by Defendants continues so long as Oasis continue to collect fees from the Plan. There is a significant information imbalance between participants, on the one hand, and Defendants, on other hand, with respect to how these fees are used, and whether the associated services are reasonable, necessary, and properly paid by the Plan. Defendants therefore should be required to submit to independent oversight of fees received from the Plan.

IV.   **PLAINTIFFS LACKED KNOWLEDGE OF DEFENDANTS' CONDUCT.**

60.    Plaintiffs did not have actual knowledge of Defendants' fiduciary breaches and other conduct that failed to comply with ERISA more than three years before the date that Plaintiffs initiated their claims under the Plan's claim procedure. Plaintiffs had no knowledge regarding Defendants' decision-making processes in operating the Plan since 2010 or the purpose of certain reimbursements from Plan assets under Defendants' control. Plaintiffs instead relied upon plausible inferences drawn from facts that had been publicly disclosed. Plaintiffs learned additional facts regarding Defendants' decision-making processes and other transactions through disclosures made during the Plan's administrative claim procedure.

## CLASS ACTION ALLEGATIONS

61.    Section 1132(a)(2) of ERISA authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to recover for the Plan the remedies provided by 29 U.S.C. § 1109(a). Plaintiffs seek to pursue their claims on a class basis pursuant to this statutory provision and consistent with the Federal Rules of Civil Procedure.

62.    Plaintiffs assert their claims against Defendants on behalf of the following Class:[8]

> All participants and beneficiaries of the Plan at any time on or after January 1, 2010, excluding Defendants, any of Oasis' directors, and any officers or employees of Oasis with responsibility for the Plan's investment or administrative functions.

63.    <u>Numerosity</u>:   The Class is so numerous that joinder of all Class members is impracticable. The Plan had approximately 10,000 to 30,000 participants with account balances at any time during the applicable period.

---

[8] Plaintiffs reserve the right to propose other or additional classes or subclasses in this proceeding.

64. <u>Typicality</u>:   Plaintiffs' claims are typical of the Class members' claims.  Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of the above-referenced mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members with regard to the Plan. Defendants' imprudent and disloyal management of the Plan caused common harm to all members of the Class.

65. <u>Adequacy</u>:   Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are aligned with the Class that they seek to represent, and they have retained counsel experienced in complex class action litigation and ERISA litigation involving defined-contribution plans. Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

66. <u>Commonality</u>:  Common questions of law and fact exist as to all Class members, and predominate over any questions solely affecting individual Class members, including but not limited to:

    a.  Whether Oasis Outsourcing Holdings Inc., Oasis Outsourcing Inc., the Committee, and the Trustees are fiduciaries of the Plan;

    b.  Whether the Plan's fiduciaries breached their fiduciary duties by engaging in the conduct described herein;

    c.  Whether the Plan's fiduciaries engaged in prohibited transactions or caused the Plan to engage in prohibited transactions with other parties in interest;

    d.  Whether the Plan's fiduciaries are additionally or alternatively liable, as co-fiduciaries, for the unlawful conduct described herein pursuant to 29 U.S.C. § 1105;

    e.  Whether Oasis Outsourcing Holdings Inc. and Oasis Outsourcing Inc. breached their duty to monitor other fiduciaries to ensure the Plan was being managed in compliance with ERISA; and

    f.  The proper measure of monetary relief;

g.   The proper form of injunctive relief.

67.    Class certification is consistent with Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate claims against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

68.    Class certification is also consistent with Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.   Any award of equitable relief would be dispositive of non-party participants' interests.   The accounting and restoration of the property of the Plan that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other Plan participants.

69.    Class certification is also consistent with Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class proceeding is superior to other available methods for the fair and efficient adjudication of the claims asserted. Defendants' conduct applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claim is relatively small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will obviate the need for unduly duplicative proceedings that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests

of justice and efficiency, it would be desirable to resolve all Class members' claims in a single proceeding.

## COUNT I
### Breach of Duties of Loyalty and Prudence
### 29 U.S.C. § 1104(a)(1)(A)–(B)

70.     Plaintiffs repeat and re-allege Paragraphs 1 through 69 of the Complaint as though fully set forth herein.

71.     Defendants are fiduciaries of the Plans under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

72.     Section 1104 of ERISA imposes fiduciary duties of prudence and loyalty upon these Defendants in their administration of the Plan and in their selection and monitoring of the Plan's investments.

73.     The scope of the fiduciary duties and responsibilities of Defendants includes managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, defraying reasonable expenses of administering the Plan, and acting with the care, skill, diligence, and prudence required by ERISA. Further, Defendants were directly responsible for ensuring that the Plan's administrative fees were reasonable, monitoring the Plan's service providers to ensure their fees remained reasonable while performing periodic surveys of marketplace alternatives to ensure the Plan's administrative costs remained low, selecting and retaining prudent investment options, evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plan's assets were invested prudently.

74.     Defendants failed to monitor and control the Plan's expenses to ensure that the Plan's expenses were reasonable, prudent, and in the best interest of the Plan. Specifically, Defendants favored costly service providers because those vendors provided services that were

advantageous to Oasis' business, notwithstanding high costs and deficient services for the Plan and Plan participants.

75.     Moreover, Defendants allowed their imprudent choice of service providers unreasonably limit the Plan's investment options. Defendants should have circumvented these limitations with superior skill and effort. A prudent, impartial fiduciary of a Plan with hundreds of millions of dollars to invest (like the Plan) would not have invested half the Plan's assets in unwanted, costly, underperforming funds (like Defendants did).

76.     Each of the above-mentioned imprudent actions and omissions illustrate Defendants' failures to make Plan management decisions based solely on the merits and the best interest of the Plan and its participants.  Through these actions and omissions, Defendants failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries of the Plan, and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of their fiduciary duty of loyalty under 29 U.S.C. § 1104(a)(1)(A).

77.     Through the actions and omissions described herein, Defendants also failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, thereby breaching their duties under 29 U.S.C. § 1104(a)(1)(B).

78.     Defendants are each personally liable, and all are jointly and severally liable, under 29 U.S.C. §§ 1109(a), 1132(a)(2), and (a)(3), to make good to the Plan the losses resulting from the aforementioned breaches, and to restore to the Plan any profits Defendants made through the use of the Plan's assets.

79.     Defendants knowingly participated in each fiduciary breach of the other Defendants, knowing that such acts were a breach, and enabled the other Defendants to commit fiduciary breaches by failing to lawfully discharge their own duties. Defendants knew of the fiduciary breaches of the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Respondent is also liable for the losses caused by the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**COUNT II**
**Failure to Monitor Fiduciaries**

80.     Plaintiffs repeat and re-allege Paragraphs 1 through 69 of the Complaint as though fully set forth herein.

81.     As alleged herein, Oasis Outsourcing Holdings Inc. and Oasis Outsourcing Inc. (collectively, "Oasis") are fiduciaries of the Plan.

82.     Oasis had overall oversight responsibility for the Plan and control over the Plan's investment options, and had the authority to direct or remove the other Plan fiduciaries to whom Oasis delegated authority, including the Committee and the Trustees.

83.     Based on Oasis' overall oversight responsibility and control of the Plan, Oasis was responsible for establishing and administering rules and procedures with respect to all matters arising under the Plan, and for monitoring the conduct of the Committee and its constituent members in selecting, overseeing, and retaining service providers and investment options available under the Plan.  Oasis was further responsible for monitoring the performance of all Oasis employees who performed functions for the Plan.

84.     A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and administration of

plan assets, and must take prompt and effective action to protect the plan and participants when the monitored fiduciaries fail to perform their fiduciary obligations in accordance with ERISA.

85.     Oasis breached this fiduciary duty to monitor by, among other things:

a)   failing to monitor and evaluate the performance of other Defendants or have a system in place for doing so, standing idly by as these Defendants made Plan-related decisions based upon their own self-interest, retained expensive service providers that were ill-suited in light of the Plan's size, and utilized an incentive-based compensation system for service providers that provided handsome compensation to service providers that provided no services or duplicative services to the Plan;

b)   failing to monitor the processes by which the other Defendants evaluated and monitored the Plan's investments, which would have alerted a prudent fiduciary to the preferential treatment the other Defendants gave to Lincoln out of self-interest, and not based on the best interest of the Plan's participants; and

c)   failing to remove fiduciaries whose performance was inadequate, all to the real and substantial detriment of the Plan and Plan's participants' retirement savings.

86.     As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars in losses due to excessive fees and lost investment earnings.

87.     Pursuant to 29 U.S.C. § 1109(a), 1132(a)(2), and 1132(a)(3), Oasis Outsourcing Holdings Inc. and Oasis Outsourcing Inc. are liable to restore to the Plan all losses suffered as a

result of the fiduciary breaches that resulted from their failure to properly monitor the Plan's fiduciaries.

<u>**COUNT III**</u>
**Prohibited Transactions with a Party in Interest**
**29  U.S.C. § 1106(a)(1)**

88.     Plaintiffs repeat and re-allege Paragraphs 1 through 69 of the Complaint as though fully set forth herein.

89.     As the Plan sponsor and a service provider for the Plan, Oasis Outsourcing Holdings Inc. is a party in interest under 29 U.S.C. § 1002(14)(A)–(C). As the operating entity that discharges fiduciary functions assigned to Oasis Outsourcing Holdings Inc., and as a service provider for the Plan, Oasis Outsourcing Inc. is also a party in interest pursuant to 29 U.S.C. § 1002(14)(A)–(B). Other subsidiaries of Oasis and services providers of the Plan are also parties in interest under 29 U.S.C. § 1002(14)(B) & (G).

90.     Defendants caused Plan assets to be used to reimburse commissions and other payments to service providers that were not reasonable in amount and were not paid in respect of services that were necessary for the Plan.   These transfers did not comply with ERISA's prohibited transaction rules, and no exemption applied.

91.     As a direct and proximate result of these prohibited transactions, the Plan directly paid reimbursements in connection with transactions that were prohibited under ERISA, resulting in significant losses to the Plan and its participants.

92.     Pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), Defendants are liable to restore all losses suffered by the Plan as a result of these prohibited transactions, including revenues received and/or earned by parties in interest in connection with the management of Plan assets or other services performed for the Plan for more than reasonable

compensation. Further, Defendants should be enjoined from using Plan assets to make unreasonable payments to service providers for services that are not necessary to the Plan and not properly paid by Plan assets.

**COUNT IV**
**Prohibited Transactions with a Fiduciary**
**29 .S.C. § 1106(b)**

93.     Plaintiffs repeat and re-allege Paragraphs 1 through 69 of the Complaint as though fully set forth herein.

94.     Defendants are fiduciaries of the Plan pursuant to 29 U.S.C. §§ 1002(21) and 1106(b)(1).

95.     Defendants dealt with the assets of the Plan in Oasis' own interest and for Oasis' own accounts when Oasis caused the Plan to reimburse Oasis for settlor functions.

96.     Based on the foregoing facts and the other facts set forth in the Complaint, Defendants knowingly caused the Plan to engage in prohibited transactions with Oasis in violation of 29 U.S.C. § 1106(b).

97.     As a direct and proximate result of these prohibited transactions, the Plan directly or indirectly made transfers to Oasis in transactions that were prohibited under ERISA, resulting in significant losses to the Plan and its participants.

98.     Pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), Defendants are liable to restore all losses suffered by the Plan as a result of the prohibited transactions and disgorge all revenues received and/or earned by Oasis resulting directly or indirectly from the above-mentioned prohibited transactions. Further, Defendants should be enjoined from using Plan assets to reimburse Oasis for settlor functions.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs, individually and as representatives of the Class defined herein, and on behalf of the Plan, pray for relief as follows:

A.    A determination that this claim may proceed on behalf of the Class in a manner consistent with the process available under 29 U.S.C. §§ 1109(a), 1132(a)(2), and Federal Rule of Civil Procedure 23;

B.    Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.    A declaration that Defendants breached their fiduciary duties under ERISA;

D.    An order compelling Defendants to personally make good to the Plan all losses that the Plan incurred as a result of the breaches of fiduciary duties and prohibited transactions described above, and to restore the Plan to the position it would have been in but for this unlawful conduct;

E.    An order requiring all Defendants to disgorge all revenues and profits received from, or in respect of, the Plan;

F.    An order granting equitable restitution and other appropriate equitable monetary relief against Defendants including, but not limited to, imposition of a constructive trust on all the Plan's assets transferred to Defendants as a result of Defendants' unlawful conduct in violation of ERISA or a surcharge against Defendants to prevent their unjust enrichment resulting from Defendants' violations of ERISA;

G.    An order appointing an independent party to monitor Defendants' use of fees paid by the Plan to Oasis;

H.    An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine;

I.    An award of such other and further relief as may be equitable and just.

Dated: August 17, 2018

s/John Yanchunis

**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
John Yanchunis, FL Bar No. 324681
201 North Franklin Street, 7th Floor
Tampa, FL 33602
Telephone: (813) 223-5505
Fax: (813) 223-5402
jyanchunis@forthepeople.com

**NICHOLS KASTER PLLP**
Kai H. Richter, MN Bar No. 029654*
Brock J. Specht, MN Bar No. 0388343*
Brandon T. McDonough, MN Bar No. 0393259*
       *pro hac vice* applications forthcoming
4600 IDS Center
80 S 8th Street
Minneapolis, MN 55402
Telephone: 612-256-3200
Facsimile: 612-338-4878
krichter@nka.com
bspecht@nka.com
bmcdonough@nka.com

ATTORNEYS FOR PLAINTIFFS